**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Vernon Martin and Delores Martin, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiffs, | ) | **JUDGMENT AND DENYING** |
| | ) | **PLAINTIFFS' MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Turner Oil & Gas Properties, Inc., | ) | |
| | ) | Case No. 1:11-cv-102 |
| Defendant. | ) | |

Before the court are cross-motions for summary judgment.  (Docket Nos. 13 and 15).  For the reasons set forth below, the court grants defendant's motion and denies plaintiffs' motion.

I.      **BACKGROUND**

Plaintiffs Vernon and Delores Martin are North Dakota residents who own mineral interests in Mercer County, North Dakota.  Defendant Turner Oil and Gas Properties, Inc. ("Turner") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.  At the times relevant to this case, Turner was a leasing agent for Continental Resources, Inc. ("Continental"), an oil exploration company.

On July 25 2008, the Martins met with Jim Rice, an agent for Turner, and agreed to lease some of their mineral interests in Mercer County to Continental.  Rice provided the Martins with three documents memorializing the agreement, including an oil and gas lease between the Martins and Continental, a 30-banking-day draft payable to the Martins by Turner, and a lease purchase report summarizing the terms of the agreement, collectively herein the "leasing documents."  Turner's nonpayment of the bank draft is the subject of this suit.

1

The oil and gas lease between the Martins and Continental granted Continental the exclusive right to explore and develop oil and gas on "1,162.63 acres, more or less" in Mercer County for a five-year term beginning July 25, 2008 and ending July 24, 2013.[1]  The lease purchase report indicated that the lease covered 1,162.63 gross mineral acres and 628.60 net mineral acres and provided for a bonus of $300.00 per net acre for a total bonus of $188,578.50.[2]  The bank draft in the amount of $188,578.50 was payable by Turner, "the Drawee," to the Martins, "the Payee," through the Bank of Nichols Hills, "the collecting bank," as bonus consideration for the mineral interests described in the lease.[3]  The draft stated it was payable through the collecting bank, "On approval of documents(s) [sic] described hereon and on approval of title to same by Drawee not

---

[1] The oil and gas lease describe the leased property as:
TOWNSHIP 142, RANGE 90 WEST:

| | |
|---|---|
| Section 20: | SW/4 |
| Section 29: | W/2 and NE/4 |
| Section 30: | S/2 S/2 & NE/4 SE/4 & A strip of land located in SE/4 NE/4 containing (1) acre and divided as follows: Beginning at the east quarter section corner of section 30 then running due west along the middle line of said section 660 feet then due north 66 feet, then due east parallel with the middle section 660 feet, to the east section line, then due south along the east section line 66 feet to the point of beginning all in section 30. |
| Section 31: | N/2 |

[2] The lease purchase report described the Martins' interest as:

| DESCRIPTION | GROSS | DECIMAL | NET |
|---|---|---|---|
| **Township 142 North, Range 90 West** | | | |
| Section 20: SW/4 | 160.00 | 68.75% | 110.0000 |
| Section 29: W/2 and NE/4 | 480.00 | 62.50% | 300.0000 |
| Section 30: S/2 S/2 & NE/4 SE/4 & A strip of land located in SE/4 NE/4 containing (1) acre and divided as follows. Beginning at the east quarter section corner of section 30 then running due west along the middle line of said section 660 feet then due north 66 feet, then due east parallel with the middle section line 660 feet, to the east section line, then due south along the east section line 66 feet to the point of beginning all in section 30. | 201.00 | 68.75% | 138.1875 |
| Section 31: N/2 | 321.63 | 25.00% | 80.4075 |
| | 1162.63 | | 628.5950 |

[3] The draft described the interest as "all of Lessor's interest in the following described lands: Township 142 North, Range 90 West: Section 20, Section 29, Section 30 and Section 31."

2

more than 30 banking days after the arrival of this draft at collecting bank." Turner recorded the lease on July 29, 2008.

The Martins deposited the draft for collection at Dakota Community Bank in Hebron, North Dakota on July 28, 2008. The Bank of Nichols Hill received the draft on July 30, 2008. On September 9, 2008, the draft was returned unpaid from the Bank of Nichols Hills to Dakota Community Bank. A notice returned with the unpaid draft included a handwritten note that stated, "Need new lease. The acreage is wrong so the amt of bonus will change."

Upon receiving the documents, Vernon Martin added handwritten notes to each. Martin wrote a note on the back of the draft that stated:

> I need to know if your [sic] not going to send my Bonas [sic] money–then I want my oil lease contract back so I can go somewhere else
>
> Please respond
> Vernon A Martin
> Hebron, ND

(Docket No. 14-3). Martin wrote a note on the notice that stated:

> I need to know if your [sic] not going to send my Bonas [sic] money–then I want my Oil & Gas lease contract back so I can go somewhere else
>
> (Please respond)
> Vernon A Martin

(Docket No. 14-5). After adding the notes, Martin returned the unpaid draft and the notice, or copies of those documents, to Turner.

Vernon Martin testified in his deposition that besides receiving the notice and the returned draft, he did not receive any other information from Turner regarding the reason for nonpayment. Martin also testified that other than adding the notes and returning the documents, he did not contact Turner to inquire about why the draft was not paid. At some point, Turner prepared a second lease

purchase report with the words "Do Not Pay Yet" under the document heading.  The report indicated

that the Martins owned fewer mineral acres than reflected in the original lease purchase report,

841.00 gross mineral acres and 420.50 net mineral acres, and provided for a bonus of $300.00 per

net acre for a total bonus of $126,150.00.[4]  The parties agree that the first time Vernon Martin saw

the second lease purchase report was at his deposition in September 2012.

     The Martins did not enter into a new oil and gas lease with Continental.  On December 16,

2008, Continental recorded with the Mercer County Recorder a release of the original lease between

the Martins and Continental.

     On January 5, 2012, the Martins leased to Cirque Resources, LP ("Cirque") their mineral

interests in the same sections referenced in the 2008 lease with Continental.[5]  The memorandum of

oil and gas lease between the Martins and Cirque granted Cirque the exclusive right to explore and

develop oil and gas on "1,163.54 acres, more or less" for a one-year term beginning January 5, 2012

---

[4] The second lease purchase report described the Martins' interest as:

| DESCRIPTION | GROSS | DECIMAL | NET |
|---|---|---|---|
| **Township 142 North, Range 90 West** | | | |
| Section 20: SW/4 | 160.00 | 50.00% | 80.0000 |
| Section 29: W/2 and NE/4 | 480.00 | 50.00% | 240.0000 |
| Section 30: S/2 S/2 & NE/4 SE/4 & A strip of land located in SE/4 NE/4 containing (1) acre and divided as follows. Beginning at the east quarter section corner of section 30 then running due west along the middle line of said section 660 feet then due north 66 feet, then due east parallel with the middle section line 660 feet, to the east section line, then due south along the east section line 66 feet to the point of beginning all in section 30. | 201.00 | 50.00% | 100.5000 |
| | 841.00 | | 420.5000 |

[5] The lease between the Martins and Cirque described the leased property as:
Township 142 North, Range 90 West, 5th P.M.
Section 20:  SW
Section 29:  W2, NE
Section30:  Lot 4(40.91), SESW, S2SE, NESE, 1 acre tract in the SENE
Section 31:  Lot 1(40.82), Lot 2(40.81), E2NW, NE

with the option to extend the primary term of the lease for an additional four years.  In consideration, the Martins received a bonus payment of $100.00 per net acre for a total of 574.00 net acres resulting in a total payment of $57,400.00.

On November 21, 2011, the Martins initiated an action against Turner in state court in Mercer County, North Dakota.  The Martins alleged in the complaint that Turner owed the Martins $188,578.50 for the unpaid draft.  On December 21, 2011, Turner removed the action to federal district court.  The parties have filed cross-motions for summary judgment.

## II.   GOVERNING LAW

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, shows that no genuine dispute as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012); Fed. R. Civ. P. 56(a).  A factual dispute is material if, under the substantive law governing the issue, the dispute might affect the outcome of the suit.  Schilf, 687 F.3d at 948-49 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The parties agree that North Dakota substantive law governs this federal diversity action. See e.g., Paracelsus Healthcare Corp. v. Philips Med. Sys., Nederland, B.V., 384 F.3d 492, 495 (8th Cir. 2004).

## III.   DISCUSSION

### A.  Turner's statute-of-limitation defense

Turner argues it is entitled to judgment as a matter of law because the three-year statute of limitations under N.D.C.C. § 41-03-18(3), expired before the Martins filed suit.  The Martins respond that N.D.C.C. § 41-03-18(3) does not apply.  They assert that the applicable statute of

limitations is N.D.C.C. § 41-03-18(1) and that they filed their suit within the applicable six-year statutory period.

Here, neither party is correct as to the applicability of § 41-03-18.  N.D.C.C. ch. 41-03 applies only to "negotiable instruments."  See N.D.C.C. § 41-03-02.  The primary characteristic of a "negotiable instrument" is that it is "an unconditional promise or order  to pay a fixed amount of money[ .]"  N.D.C.C. § 41-03-04(1);  see also § 41-03-06 (defining an "unconditional promise or order").  Since the bank draft in this case contained conditions, it was not a "negotiable instrument."  Therefore, § 41-03-18 does not apply, and Turner's defense premised upon the applicability of subsection (3) of that section fails.[6]

### B.   The Martins' arguments for why they are entitled to recover a bonus payment

#### 1.   Introduction

Turner argues it is entitled to judgment as a matter of law because the provision of the draft stating that it was payable "[o]n approval of documents(s) [sic] described hereon and on approval of title to same by Drawee," created a condition precedent requiring approval of both the documents and title by Turner.  Turner claims it did not give its approval  because the Martins did not have title to the full 628.60 net mineral acres described in the leasing documents.

The Martins do not dispute that they owned fewer than 628.60 net mineral acres.  Also, they do not appear to contest that this was the reason why Turner failed to honor the bank draft for

---

[6]  The fact that the parties' reliance on either subsection (1) or (3) of § 41-03-18 is misplaced is further made clear by looking at how N.D.C.C. ch. 41-03 defines and uses the terms "draft," "note,"  "instrument," and "negotiable instrument."  In particular, N.D.C.C. §§ 41-03-03(2)(m),(s)&(x) and 41-03-04(1)-(2)&(5) make clear that the references to "note" and "draft" in  § 41-03-18 are not to all notes and drafts, but rather only those that are "negotiable instruments."  Consequently, in the absence of the parties pointing to a more applicable statute, the court presumes that the limitations period is six years as provided for by N.D.C.C. § 28-01-16(1), which applies to all claims for breaches of contract and other obligations in the absence of a more specific statute.  See, e.g., Hager v. City of Devils Lake, 2009 ND 180, ¶ 34, 773 N.W.2d 420.

payment of the bonus.  They present two arguments for why the fact that they did not own all of the 628.60 net mineral acres originally contemplated makes no difference with respect to the right to enforce payment of the bonus under the leasing documents.

      **2.**    **The Martins' argument that the recording of the lease constituted its acceptance and/or a waiver of any conditions precedent**

The Martins primary argument is that, even if there was a condition precedent that allowed Turner to back out of the lease transaction, Turner accepted the lease and waived any conditions precedent by recording it.  In addressing this argument, the parties have not cited to any North Dakota cases that have decided whether the recording of a lease under these circumstances amounts to an acceptance of the lease and/or a waiver of any conditions precedent to completing the lease transaction.  Courts in at least two other jurisdictions, however, have concluded that the mere recording of the lease will not constitute acceptance or a waiver of the conditions precedent, since the usual purpose of recording the lease in these situations is to give notice to third parties of the pending transaction.  Sun Exploration and Production Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987) ("Sun Exploration") ("We hold, however, that the mere acceptance and recordation of an oil, gas and mineral lease does not constitute such conduct inconsistent with claiming the right to approve title to the interest conveyed.");   Brice v. Pugh, 354 P.2d 1024, 1027 (Colo. 1960) ("Brice") ("Recording alone is not, as a matter of law, an acceptance of title nor does it necessarily constitute 'exercising dominion over' a lease.").

This court believes the North Dakota courts would follow Sun Exploration and Brice and conclude that the mere recording of a lease in this situation would not amount to a final acceptance of a lease or a waiver of conditions precedent set forth in the other leasing documents if it is done simply to give notice of the pending transaction to third parties.  And, since there is a logical

"innocent" explanation for why Turner recorded the lease other than it having decided to finally accept the lease and waive the conditions precedent, the Martins are required to present something more than the speculative possibility that Turner intended the latter. E.g., Brice, 354 P.2d at 1027 (stating that the mineral owner in a comparable situation had the burden of proving by a preponderance of the evidence that the recording of the lease constituted a waiver defined as "the intentional relinquishment of a known right" even with the lease having been recorded). Further, this is particularly true in the face of the evidence suggesting otherwise, including: (1) the fact that the lease was recorded by Turner on July 29, 2008, which was four days after the Martins executed the lease and received the bank draft from Turner's agent and well before the expiration of the thirty banking days that Turner had to approve the documents and title following receipt of the bank draft at the collecting bank; (2) the two versions of the "Lease Purchase Report" (the first showing a net mineral interest of 628.5950 acres, which was given to the Martins with the bank draft, and the second showing a net mineral interest of 420.5000 acres with added words "Do Not Pay Yet"), which suggests that Turner concluded sometime after providing the leasing documents to the Martins that they did not own all the mineral acres initially contemplated; (3) the statement on the notice accompanying the rejected bank draft suggesting it was refused because the Martins owned less mineral acreage than originally contemplated; and (4) Vernon Martin's conduct following the rejection of the bank draft suggesting that he understood Turner could refuse to fund the lease acquisition in this instance. See id. (pointing to the many of the same factors in concluding there was insufficient evidence of waiver).

In short, the Martins have not come forward with sufficient submissible evidence suggesting that Turner intended to finally accept the lease and waive the conditions precedent by recording it

to create an issue for trial.  In other words, Turner is entitled to summary judgment in its favor on this issue.

### 3.    The Martins' argument that there was no title defect because of the lease's "proportionate reduction" clause

The leasing documents collectively make clear that the parties contemplated that the Martins owned 628.60 net mineral acres.  In particular, the bonus amount set forth in the bank draft was calculated based on that assumption.

The  Martins do not appear to dispute (nor can they) that owning less mineral acres is a title defect - at least in a general sense.  Rather, their argument here is that the parties intended that the "proportionate reduction" clause in the lease would provide for any adjustment required if it turned out that the Martins owned less mineral acres than contemplated, so there would be no title defect in that instance.

There are several problems with this argument.  The first is that the better construction of the leasing documents taken as a whole is that Turner had the right to have the conditions precedent satisfied before the lease would become binding upon Turner.  And here, since the condition precedent was invoked because the Martins did not own all of the contemplated mineral acres, the "proportionate reduction" clause never became effective.

The second problem is that, even if the proportionate reduction clause could be considered, the clause as drafted for this lease provides only for an adjustment of the royalty in the event there are less mineral acres.  In particular, the clause reads as follows:

> 5.  If said Lessor owns a less interest in the above-described land than the entire and undivided fee simple estate therein, then the royalties (including any shut-in gas royalty) herein provided for shall be paid the said Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

Literally then, neither it, nor anything else in the bank draft or the lease purchase report, required that Turner accept a lesser number of mineral acres than originally contemplated and foreclosed its ability to claim a title defect - either because it (or, perhaps, Continental) did not want to go forward with a lesser number of net mineral acres for whatever reason, including not having to pay the full bonus amount.

The Martins argue that Turner need not have been concerned about having to pay the full bonus amount if it accepted the lease, however, because that too would be adjusted by the "proportionate reduction" clause. However, that was not the position the Martins took in making their argument that Turner had accepted the lease when it was recorded. In that instance, their first position was that the full amount of the bonus was payable, *i.e.*, they were not willing to concede that the "proportionate reduction" clause automatically applied.

In fact, it appears the only way that Turner could guarantee not having to pay the full bonus was to reject the bank draft (which was for the full bonus amount) because of lack of title to all of the mineral acres upon which the bonus was calculated. This is because, if it had accepted the lease, it ran the risk of the Martins not agreeing to either refund part of the bonus, if it let the bank draft go through, or the Martins suing for the full amount of the bonus if it kept the lease and tendered a new draft for a lesser bonus amount. And, in that instance, it might very well have lost because the prevailing view appears to be that a "proportionate reduction" clause in a lease that addresses only the adjustment of royalty and not specifically the bonus will not adjust the bonus amount. See Probst v. Ingram, 373 P.2d 58, 61-62 (Okla. 1962) (dicta); see generally Hemingway Oil and Gas

Law and Taxation § 7.8 (4th ed. 2004); but see Barker v. Boyer, 794 P.2d 322, 324 (Kan. Ct. App. 1990) (dicta).[7]

In short, the Martins' argument that the "proportionate reduction" clause in the lease eliminated any right on the part of Turner to claim a title defect based on the Martins owning less than the number of mineral acres originally contemplated fails.[8]

## C.   Turner's rescission argument

Turner argues it is entitled to judgment as a mater of law because Turner was permitted to rescind its contract with the Martins.  Turner asserts it was permitted to rescind because its consent was given based on the parties' mutual mistake of material fact regarding the number of mineral acres owned by the Martins.  Turner further asserts that both parties consented to rescission.  Turner

---

[7] On the other hand, if Turner had rejected the bank draft and tendered a new one for a lesser amount of bonus, it would be highly questionable whether Turner could have forced the Martins to continue with the deal if they were dissatisfied with the amount of the bonus.

[8] While the condition in the bank draft allowing for "approval of title" may by its wording imply a requirement that there be a legitimate title issue before Turner could dishonor the draft for that reason, there was another condition in the bank draft that, on its face, was arguably broader, i.e., Turner's right of "approval of documents."  Unexplored here is the extent of Rice's authority (apparent or actual) and whether his issuance of the draft, his providing of the initial lease purchase report to the Martins, and his obtaining the Martins' signatures on the lease to Continental was sufficient "approval of documents" to bind Turner.  See Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1215-16 (8th Cir. 2012).  And, if not, there may be a question whether Turner's right to "approve" the documents was unconstrained or whether it was subject to an implied obligation of "good faith and fair dealing."  In some jurisdictions, it probably would be the latter.  See id. at 1216 ("Under Arkansas law, however, parties to a contract have an affirmative duty to exercise good faith and fair dealing in the fulfillment of conditions precedent in a contract.")  However, that may not be true in North Dakota.  So far, the North Dakota Supreme Court has only been willing to imply a covenant of "good faith and fair dealing" in insurance contracts and has left it up to the Legislature to decide in what other types of contracts the covenant should be implied, such as under the UCC.  See, e.g., Macquarie Bank Ltd. v. Knickel, 723 F. Supp. 2d 1161, 1193 (D.N.D. 2010);  WFND, LLC v. Fargo Marc, LLC, 2007 ND 67, ¶ 17, 730 N.W.2d 841 ("[i]n North Dakota the doctrine of an implied covenant of good faith and fair dealing has only been applied to insurance contracts.") (quoting Dalan v. Paracelsus Healthcare Corp., 2002 ND 46, ¶ 11, 640 N.W.2d 726).

The court is not unsympathetic with the Martins' argument that Turner was able to bind them for a certain period of time and speculate with their interests without having paid anything.  However, this is the program that they signed up for.  This is another good example of why mineral owners would be well-advised to consult with an attorney knowledgeable about these matters before leasing their interests.

asserts that the Martins consented by writing the request for release of the lease on the returned draft and notice and that Turner consented when Continental recorded the release of the original lease.

Given the court's earlier conclusions, the court need not address this argument.

## IV.   CONCLUSION AND ORDER

Based on the foregoing, the court **GRANTS** Turner's motion for summary judgment of dismissal of the Martin's complaint (Docket No. 13) and **DENIES** the Martins' cross-motion for summary judgment (Docket No. 15). The Martins' complaint is hereby **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 21st day of March, 2013.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

12